IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * |
| JAMES WESLEY THOMAS | * Crim. No. **PJM 13-0458** |
| Defendant | * |

### MEMORANDUM OPINION

James Wesley Thomas appeals Magistrate Judge (MJ) Thomas DiGirolamo's April 30, 2013 decision finding him guilty of fleeing to elude the police (Count 2), driving a motor vehicle in wanton and wilful disregard for the safety of persons and property (Count 3), and operating a vehicle in excess of the speed limit (Count 4), all Class B misdemeanors. He was sentenced to 6 months imprisonment as to Count 2, 6 months consecutive imprisonment as to Count 3, and 6 months concurrent imprisonment as to Count 4.

For the reasons that follow, the Court **AFFIRMS** Judge DiGirolamo's decision.

### I.

By Criminal Complaint filed on July 12, 2012, Thomas was charged with assaulting a federal officer in violation of 18 U.S.C. §111(a)(1), a Class A misdemeanor carrying a maximum penalty of one year imprisonment (Count 1) and the three Class B misdemeanors recited above (Count 2-4). On the basis of the Class A misdemeanor charge, he requested a jury trial before a district judge. On November 19, 2012, on the Motion of the Government, MJ DiGirolamo signed an Order amending the Complaint to reduce Count 1 to a Class B misdemeanor so that the case would remain with the MJ as opposed to the District Court. On April 29, 2013, the day of trial, but immediately prior to its commencement before the MJ, the Government dismissed

Count 1 altogether, and proceeded only on the three remaining misdemeanor counts: fleeing to elude the police, reckless driving, and speeding.

At trial the Government called two officers with the United States Park Police. The first, Officer Gogarty, testified that he was driving south on the Baltimore-Washington ("B-W") Parkway at approximately 10:45 p.m. on July 11, 2012 when he observed a Mercedes Benz in front of him in the left lane. The Mercedes abruptly changed into the right lane, went off the road onto the right shoulder, then took off at a high rate of speed, passing two vehicles ahead of him. Based on his own speedometer and moving radar, Gogarty determined that, at the point of Good Luck Road, the Mercedes was travelling at a speed of approximately 104 miles per hour. The posted speed at that juncture was 55 miles per hour. Gogarty thereupon radioed to Officer Ferreyra, who was at a position south of Gogarty's location. Ferreyra testified that he waited on the right shoulder of the B-W Parkway at the junction of Route 410 until the Mercedes approached. As the Mercedes with Gogarty in pursuit approached Route 410, Gogarty activated his emergency lights and his siren. The Mercedes accelerated. Ferreyra then activated his emergency equipment and began to enter the right lane from the right shoulder in front of the oncoming Mercedes. Both officers testified that, as it approached Ferreyra's vehicle, the Mercedes shifted from the left lane to the right lane, and headed directly toward the rear of Ferreyra's cruiser. Ferreyra, who had the impression the vehicle seemed to be trying "to run me off the road", Apr. 29 Tr 16:8, was compelled to move sharply to the right shoulder of the road to avoid being hit, and momentarily lost control of his vehicle. The Mercedes meanwhile jerked back into the left lane.

Ferreyra testified that, as he tried to initiate his own pursuit of the Mercedes, he observed that the driver of the vehicle was "a man in a convertible with his left arm up . . . on the door

sill." April 29 Tr. 17:24 – 18:7. Gogarty stated that the Mercedes in question was not in fact a convertible, as he originally thought, "because it is such a small sports car, I had never seen a $250,000 Mercedes before in my life. He [the driver] had the windows open, wind was flying all over the place, his shirt was moving and it is such a thin little roof on top with it being dark, I actually originally thought it was a convertible as well." *Id.* at 67:7-13.

Gogarty continued to race after the Mercedes southbound on the B-W Parkway. As the vehicles passed Route 202, according to Gogarty's radar the Mercedes was clocked at 134 m.p.h.

After both Gogarty and the Mercedes entered the ramp indicating the exit to Kenilworth Avenue, Gogarty managed to pull alongside the vehicle, and shined a spotlight into the car, where he was able to get "a clear look at the driver's face". *Id.* at 53:1. Gogarty testified that he saw that the driver was wearing a light colored, collared shirt and noted the tag number of the vehicle. Gogarty said he observed the driver's left arm on the door frame, with his right hand on the steering wheel.

But the Mercedes continued to flee down Route 295 (which is essentially Kenilworth Avenue in the District of Columbia), traveling up to 126 m.p.h. as measured by Gogarty's radar and speedometer. According to Gogarty, the chase proceeded from Route 295 to the Capital Beltway onto Route 50, at which point the driver of the Mercedes "really was able to accelerate and open it up." *Id.* at 56:3-4. At the exit for Route 424, Gogarty terminated his pursuit.

Three hours later, having checked the motor vehicle records, Gogarty went to the home of the registered owner of the Mercedes, at which time, as it happened, Thomas drove up in the Mercedes. Gogarty identified Thomas at that time, just as he did at trial, as the same person he had observed driving the Mercedes during the July 2012 pursuit.

After Gogarty testified that he had tested his radar the evening of July 11, 2012 to ensure it was working properly, the Government, over Thomas' objections, moved into evidence under the business records exception a certification of the accuracy of Gogarty's radar unit.

Thomas called four witnesses on his behalf.

Dr. Potolicchio, a practicing neurologist, testified that he treated Thomas in July 2010, a year after Thomas was hit by a truck while riding a motorcycle, and saw him again in January 2012. Dr. Potolicchio testified that Thomas was unable to pick up his right arm, or move the arm from side to side, and showed little strength in his right hand muscles and limited mobility in his left elbow. Dr. Potolicchio therefore testified that "I don't see how he could operate a motor vehicle with just his right arm."

Thomas' second witness, Paul Koch, a private investigator, testified that he performed a simulation in a parking lot that showed the difficulty of identifying the Mercedes or its driver in the dark. A third defense witness, Officer Cameron Easter, testified that he delivered Thomas' case file to the Office of the Attorney General. The final defense witness, Alexander Ewings, a friend of Thomas, testified that Thomas drives with his left arm and lets people borrow his Mercedes.

MJ DiGirolamo found Thomas guilty of fleeing and eluding, reckless driving and traveling 134 mp.h. in a 55 m.p.h. zone. On August 7, 2013, he sentenced Thomas to six months imprisonment as to Count 2, six months imprisonment as to Count 3 consecutive to Count 2, and six months imprisonment as to Count 4, concurrent with Count 3, a total of twelve months in custody. Thomas has been serving his sentence pending this appeal.

### III.

Federal Rule of Criminal Procedure 58(g)(2)(D) provides that the scope of an appeal from a magistrate judge's judgment "is the same as in an appeal to the court of appeal from a judgment entered by a district judge." Accordingly, in reviewing a judgment of conviction entered by a magistrate judge, the "district court utilizes the same standards of review applied by a court of appeals in assessing a district court conviction," rather than conducting a "trial de novo." *United States v. Bursey*, 416 F.3d 301, 305 (4th Cir. 2005). Findings of fact are reviewed for clear error, and issues of law are reviewed de novo. *Id.* (citing *United States v. Leftenant*, 341 F.3d 338, 342-43 (4th Cir. 2003)).

### IV.

Thomas raises several issues on appeal.

#### A.

He argues first that Judge DiGirolamo committed factual error in finding that he was the driver of the Mercedes in question because the Judge did not take into account Thomas' alleged impairment, accepting Officer Gogarty's testimony that the driver of the Mercedes had his left arm on the door and right arm on the steering wheel over Dr. Potolicchio's testimony that Thomas would not have been able to drive with his right arm alone. This argument is without merit.

"A defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal quotation omitted). In reviewing the sufficiency of such evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "Our review is limited to determining whether substantial evidence supports the conviction." *United States v. Burgos*, 94 F.3d 849, 853 (4th Cir. 1996).

MJ DiGirolamo made a factual determination that Thomas was able to drive the Mercedes as described by Officer Gogarty. He also concluded that Thomas was the registered owner of the vehicle Gogarty had chased and that Gogarty clearly recognized Thomas as the driver of the vehicle, both on the night of the incident and again at trial. The MJ observed Officer Gogarty and Dr. Potolicchio during their testimony and ultimately concluded that Thomas was the driver of the vehicle. The Court finds no clear error in MJ DiGirolamo's credibility determinations. There was substantial evidence to support his conclusion that Thomas was the driver.

B.

Thomas next argues that MJ DiGirolamo implicitly shifted the burden of proof to him to disprove the Government's evidence that he was the driver of the Mercedes. The MJ, he argues, was "fixated" on Thomas' failure to provide an alibi or any evidence regarding who was driving his vehicle. This Court will treat this as a question of law, subject to de novo review.

Judge DiGirolamo began his oral ruling on April 30, 2013 by emphasizing that the Government bore the burden of proof, and that Thomas, as Defendant, did not need to produce any evidence at trial. *See* Apr. 30 Tr. at 42:8-22, 52:15-17. The MJ carefully reviewed the elements of each of the three offenses and had no difficulty finding the driver of the Mercedes guilty of each offense. He then turned to "the real issue in this case . . . the identification of the Defendant as the driver of the Mercedes." *Id.* at 50:5-7.

The critical evidence of identification that MJ DiGirolamo had before him came from Officer Gogarty. The Judge found the officer's testimony credible and was not persuaded otherwise by Dr. Potolicchio's testimony. Judge DiGirolamo did note that the defense strategy was "to just raise reasonable doubt in the Government's case", not to provide "affirmative alibi witnesses". *Id.* at 52:19-21. The Court acknowledged the problematic nature of this strategy:

> I mean, the 200 ton elephant in the room is the Court did not hear who was driving this ca[r] if it was not the Defendant. I did not hear that. There is no obligation for the defense to prove that, but if you are asking what I did not hear, I did not hear anything about that. The only evidence I heard of identification of the driver is from Officer Gogarty, nothing else.

*Id.* at 52:23 – 53:4.

The MJ made this observation in the context of weighing all the evidence before him, and in assessing the credibility of Officer Gogarty's identification testimony. The fact that there was "no evidence as to who else might have had the car", *id.* at 55:2-3, was no more than a statement of fact. But Judge DiGirolamo could not have been clearer:

> So, and again in case this does go up on appeal, I want to be clear that I am not faulting the Defendant for providing evidence of who was driving. The Defendant does not have that burden to do and I understand that. But, it remains as part of the evidence, I don't know who was driving if I am to believe the Defendant's case. And the only evidence of identification is really from Officer Gogarty and I find that evidence to be credible.

*Id.* at 55:714. This Court finds no error of law in Judge DiGirolamo's analysis. He engaged in no impermissible burden-shifting.

### C.

Thomas next argues that Judge DiGirolamo erred in admitting Officer Gogarty's in-court and out-of-court identifications of him.

Motions to suppress evidence must be made pretrial, or the objection is considered waived. Fed. R. Crim. P. 12(b)(3)(C), 12(e). "For good cause, the Court may grant relief from

the waiver." Fed. R. Crim. P. 12(e). In the absence of plain error, failure to object to testimony or other evidence at the time it is offered at trial will preclude consideration of the objection on appeal. *See, e.g., United States v. Maxton*, 940 F.2d 103, 105 (4th Cir. 1991); Fed. R. Crim. P. 52(b).

There is no record of Thomas making pretrial or even trial objections to Officer Gogarty's identifications. Defense counsel may have argued in closing that the identifications were suspect, but he made no objection to the identifications during the trial testimony. Since Thomas has not demonstrated "good cause" for failing to object to the identification when made either before or during trial, and has not met any of the four elements of plain error test[1], the Court declines to consider this objection on appeal.

### D.

On appeal, Thomas renews his trial objection that the radar calibration certificate offered for admission by the Government under the business records exception was improperly admitted because Officer Gogarty was unable to lay the proper foundation for its admission.

The radar certificate was received in evidence pursuant to Fed. R. Evid. 803(6). It indicates that the radar unit in Gogarty's vehicle was certified on April 15, 2010 by Sgt. Adam E. Zielinski, and expired on April 13, 2013. *See* Govt. Ex. 1. Thomas argues that Gogarty was not qualified to verify the document, and that the Government was required to produce Sgt. Zielinski to verify it.

Generally, evidentiary rulings are reviewed by an appellate court for abuse of discretion. *United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009). The radar certificate at issue was

---

[1] Under the plain error analysis, a defendant must show that (1) an error occurred; (2) the error was plain; (3) the error affected his substantial rights; and (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Wilkinson*, 137 F.3d 214, 223 (4th Cir. 1998) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

non-testimonial since it did nothing more than verify the accuracy of the testing device. But it "must still meet all requirements of the Federal Rules of Evidence to be admitted." *United States v. Bacas*, 662 F. Supp. 2d 481, 486 (E.D. Va. 2009) (finding that the Supreme Court's decision in *Melendez-Diaz v. Massachusetts* did not bar the admission of calibration certificates); *accord United States v. Forstell*, 656 F. Supp. 2d 578, 580-81 (E.D. Va. 2009) (holding certificates that verify the accuracy of testing devices and equipment "are nontestimonial, and, thus, their admission does not run afoul of the Confrontation Clause.").[2]

Fed. R. Evid. 803(6) permits the admission of "records of a regularly conducted activity" as an exception to the rule against hearsay if the record's proponent establishes that the record: (1) was made contemporaneously with the act; (2) by a person with knowledge; (3) in the regular course of business; and, (4) that it was the regular practice of the business to keep such records. "The custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices." *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003). Either "the custodian or another qualified witness" may lay the foundation for the records' admission. Fed. R. Evid. 803(6). The issue here is whether Gogarty was an "otherwise qualified witness". Thomas contends that the Government did not establish that Gogarty was "familiar with the creation and record keeping procedures" of the Park Police, per *Bacas*, 662 F. Supp. 2d at 487, because he did not expand upon what he meant when he said that Zielinski "does the certifications", did not

---

[2] *See also Williams v. Illinois*, 132 S. Ct. 2221, 2243 (2012) ("In *Melendez–Diaz* and *Bullcoming*, the Court held that the particular forensic reports at issue qualified as testimonial statements, but the Court did not hold that all forensic reports fall into the same category. Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial. . . . The [crime lab] report is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual."). In *Williams*, the Supreme Court held that the admission of expert testimony about the results of DNA testing performed by non-testifying analysts did not violate the Confrontation Clause.

state that the record themselves were created at or near the time of testing, and did not demonstrate any specific knowledge regarding his department's record keeping requirements.

Gogarty, however, testified that he was a member of the Traffic Safety Unit, certified by the U.S. Park Police to operate a radar unit. He identified the radar certification of the unit he was using the night of the case, explained that the original certificates are kept in the Traffic Safety Unit, and stated that copies were routinely kept in the district courts. He recognized the signature on the certification as that of Adam Zielinski, who handles all of the radar certifications for the Park Police, and testified that all such units are certified for two to three years. The Court finds that Officer Gogarty's testimony was sufficient for the MJ to find that Gogarty was a qualified witness, and that the MJ committed no error of law or fact in admitting the certificate under Rule 803(6).

E.

Thomas raises several arguments pertaining to the amendment of Count 1 of the Criminal Complaint which, as indicated, originally charged him with a Class A misdemeanor potentially triable to a jury. He argues (1) that MJ DiGirolamo lacked jurisdiction to grant the Government's Motion to Amend the Complaint to eliminate the charge triable to a jury; (2) that the amendment was improper under Fed. R. Crim. P. Rule 7(e) because it deprived him of his "substantial right" to a jury trial; and (3) that the Government acted vindictively by amending the Complaint to reduce the severity of Count 1. Thomas ties this all together by arguing that he was denied his Sixth Amendment right to a jury trial.

None of these arguments is persuasive.

On October 4, 2012, Thomas requested "a trial by jury, to be presided over by a district judge" on the basis of Count 1, the only Class A misdemeanor charge and the only charge which

afforded him a right to a jury trial and a right to be tried before a District Judge. *See Lewis v. United States*, 518 U.S. 322, 326 (1996); 18 U.S.C. §3401(b).[3] At that point, the matter appears to have been placed before U.S. District Judge Alexander Williams.[4] On November 14, 2012, the Government filed its Motion to Amend Complaint to reduce Count 1 from a Class A misdemeanor to a Class B misdemeanor. The Motion was not acted upon by Judge Williams, but by MJ DiGirolamo who, on November 19, 2012, signed the proposed Order reducing the Class A to a Class B misdemeanor, leaving no charge triable to a jury.[5] Trial was held April 19-20, 2013, some 5 months later. On April 29, 2013, just before the bench trial commenced, the Government informed the Court that it was dropping Count 1 entirely, and would proceed only on Counts 2-4. Apr. 29 Tr. 9:16-25. Thomas interposed no opposition and the MJ obviously granted the Motion. *See* Fed. R. Crim. P. 48 (the Government must seek leave of court to dismiss a complaint prior to trial).

Indeed, the Court notes that Thomas had several opportunities to object to the MJ's Order granting the original Motion to Amend and never did until the instant appeal. Not only did he fail to file any objection to the Government's Motion; he never sought to have a District Court Judge review the MJ's grant of the amendment. That was his first waiver of the argument. *See* Local Rule 302 ("Appeals in criminal cases shall be made to the District Court within fourteen (14) days from entry of the decision, order . . . in accordance with Fed. R. Crim. P. 58(g)(2)"); Fed. R. Crim. P. 58(g)(2) ("Either party may appeal an order of a magistrate judge to a district judge within 14 days of its entry if a district judge's order could similarly be appealed.").

---

[3] The "Jury Trial Demand" was dated October 2, 2014, and was received by the Court on October 4, 2012, but was not entered onto the docket until October 25, 2012. *See* Dkt. 9, 12-cr-0556-TMD.
[4] The original case number for this matter was 12-3223-WC. The case was reassigned from MJ William Connelly to MJ DiGirolamo on July 13, 2012. After Thomas filed his Jury Trial Demand, a new case number was opened (12-556-AW) and the case was reassigned to Judge Williams. When the subsequent Order was entered amending the Complaint, Case No. 12-566 was reassigned back to MJ DiGirolamo.
[5] The Order was docketed the next day, on November 20, 2012.

Thomas made no objection for another 5 months. In addition, Thomas did not object at trial to either the amendment of Count 1, or the ultimate dropping of the charge. Apr. 29 Tr. 9:1-10:4. That was his second waiver. "[A] appellate review is forfeited when a party fails to seek timely review by a district judge of an adverse ruling by a magistrate judge." *Wertz v. Grubbs*, 1995 WL 3164 at *4, 45 F.3d 428 (4th Cir. 1995) (citations omitted). The Court finds that claim of the denial of jury trial may not be raised for the first time on appeal, which is what Thomas attempts to do here.

Even assuming arguendo that Thomas is correct that a District Judge and not a MJ should have been the one to decide whether to allow the amendment of the Complaint to allege a Class B instead of a Class A misdemeanor, it is difficult to see how that helps his cause.

If the Motion to Amend away the Class A misdemeanor should have been decided by a district court judge, what would the remedy be where Thomas was never tried on that charge? Counts 2-4, petty offenses with maximum terms of imprisonment of 6 months each, carry no right to be by a jury. *United States v. Merrick*, 459 F.2d 644, 645 (4th Cir. 1972).[6] The remedy certainly cannot be to retry the three non-jury triable offenses, which were properly tried before a Magistrate Judge. They remain valid for the reasons previously stated. The error, if any, would seem to be confined to reconsideration of Count 1, the Class A misdemeanor charge. What Thomas at least says he should have had was a jury trial on that count. So, perhaps, if Thomas really wishes to have a trial before a jury on Count 1, which alleges a violation of 18 U.S.C. § 111(a)(1), a Class A misdemeanor, the Court might be willing to allow him to have one. But the Court senses that this may not be the relief that Thomas really wants. Whatever the case, the Court sees no need to strike the convictions that the MJ returned on Counts 2-4.

---

[6] Thomas made no objection at trial when MJ DiGirolamo stated as much: "All right, so those are all Class B misdemeanors which do not allow Mr. Thomas the right to a jury trial in this Court and also does not allow him the right to a District Judge." Apr. 29 Tr. at 10:1-4.

Nor can it be said that the Government acted vindictively in amending the Complaint. The Complaint was amended five months prior to trial, then Count 1 was dropped entirely at trial. Thomas was well "informed of the nature and cause of the accusations filed against him." *Hunter v. State*, 916 F.2d 595, 598 (10th Cir.1990) (citations omitted). None of the counts the Government proceeded on were triable to a jury. Again, Thomas took no steps to challenge the MJ's ruling at the time or through trial.

As a rule, amending criminal charges properly falls within the Government's prosecutorial discretion. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.") Reducing, then dropping criminal charges altogether, vindictive? It's hard to imagine that any court would ever so hold.

### F.

MJ DiGirolamo found Thomas guilty of traveling 134 m.p.h. in a speed zone posted at 55 m.p.h., whereas the Criminal Complaint listed the posted speed was 45 m.p.h. Thomas argues that this change in the posted speed resulted in a fatal variance, and that at least his speeding conviction should be vacated. The Court disagrees.

"In general, a 'variance' occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. . . . A variance constitutes a legitimate grounds for reversal only if the appellant shows that the variance infringed his 'substantial rights' and thereby resulted in actual prejudice." *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994) (citations omitted). "[A] variance violates a defendant's rights and requires reversal only if it prejudices him, either by surprising him at trial and hindering the preparation of his defense, or

by exposing him to the danger of a second prosecution for the same offense." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (citations omitted). "These notice-related concerns are not implicated when the alleged variance does not affect an essential element of the offense." *United States v. Redd*, 161 F.3d 793, 796 (4th Cir. 1998).

There was no material variance between the Criminal Complaint and the facts established at trial. To be sure, Thomas was charged with violating 36 C.F.R. 4.21(c), which reads: "Operating a vehicle at a speed in excess of the speed limit to wit: 134 m.p.h. in a posted 45 m.p.h. zone." But there is no material variance when a defendant in fact is found to have been traveling 79 m.p.h. over the permissible speed, as opposed to 89 mp.h. There was a posted speed and Thomas was operating his vehicle well in excess of it. Thomas has not argued that the variation in posted speed limits somehow hindered the preparation of his defense, nor has he argued he has suffered "actual prejudice", other of course then that he was convicted of speeding. This hypertechnical objection is not the equivalent of error on the part of the MJ. As with Thomas' other points on appeal, it is rejected.

V.

For the foregoing reasons, the Court **AFFIRMS** the trial court's judgment. A separate Order will **ISSUE**.

/s/
_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

May 6, 2014